COMPUTER AIDED DESIGN
SYSTEMS, INC.,
Plaintiff,

v.

SAFECO LIFE INSURANCE
COMPANY, Defendant.

No. 3:01–CV–90037.

United States District Court,
S.D. Iowa,
Davenport Division.

Nov. 21, 2002.

Michael McDonough, Cedar Rapids, IA, for Plaintiff.

Robert B. McMonagle, Davenport, IA, Diane M. Reinsch, Rock Island, IL, Thomas G. Rohback, Hartford, CT, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Before the Court are Plaintiff Computer Aided Design Systems, Inc.'s (CADSI) and Defendant Safeco Life Insurance Company's (SAFECO) competing motions for summary judgment. The parties have submitted the requisite briefs and affidavits in support and in resistance to each others motions. The Court heard oral argument on both motions on October 3, 2002. The matter is fully submitted. With reference to the discussion below, the Court denies Defendant's motion. Plaintiff's Motion for Summary Judgment is granted.

## I. BACKGROUND

Plaintiff CADSI is an Iowa corporation with its principal place of business in Coralville, Iowa. Defendant SAFECO is a large insurance company with its principal place of business in Redmond, Washington.

On March 1, 1998, CADSI established a self-funded employee health benefits plan (the Plan) to provide health and accident benefits to its employees and their dependents. In establishing the plan, CADSI recognized a need to indemnify itself against potentially large claims, and contacted SAFECO regarding excess loss insurance coverage. Before agreeing to provide coverage, SAFECO required that CADSI meet several conditions. SAFECO first required that CADSI assume the risk of making coverage decisions pursuant to a plan governed under ERISA. Accordingly, the plan names CADSI as the plan's administrator and fiduciary with "the sole authority and responsibility to review and make final decisions on all claims for benefits." Def.App. at 10. To facilitate the day to day operation of the plan, CADSI has delegated its authority as plan administrator to Seabury & Smith, a third-party administrator that handles the processing of claims and, if necessary, the submission of those claims to SAFECO for excess loss coverage. As its second condition to providing excess loss insurance at a reasonable premium rate, SAFECO required that CADSI contract with and use the services of a SAFECO-approved, independent medical review/utilization service. Pursuant to this requirement, CADSI selected the Great Plaines Health Network ("Plaines Health").

Following CADSI accession to SAFECO's terms, and SAFECO's approval of the Plan, the two parties executed an excess loss insurance contract. The contract requires SAFECO to pay one-hundred percent of covered expenses in excess of a ten-thousand dollar deductible per covered person. Under the terms of the excess loss insurance contract, "[SAFECO's] liability is limited to reimbursing [CADSI] for payments [that CADSI has] made for covered persons for expenses covered under [CADSI's] plan." Def.App. at 67.

In the summer of 1996, Lynda Solomon was first diagnosed with breast cancer while living in New Hampshire. Shortly thereafter, on October 23, 1996, Solomon underwent a full mastectomy of her left breast. After the surgery, Solomon continued with various other treatments until the following summer. In August 1997, Solomon's husband accepted a position with CADSI and the couple moved to Iowa City. With the commencement of her husband's employment with CADSI, Lynda Solomon became a "covered person" under CADSI's health benefits plan.

In December 1998, Solomon began the surgical process of cosmetically rebuilding her removed breast, and underwent reduction mammoplasty surgery in Cedar Rapids, Iowa. After next consulting with Dr. Al Cram of the University of Iowa Hospitals and Clinics (UIHC) regarding reconstruction of the left breast, Solomon scheduled surgery for April 20, 1999. Unfortunately, during the surgery doctors discovered a large new tumor with brain metastasises. With the discovery of the new tumor, doctors informed Solomon that she had developed Stage IV breast cancer.[1] Doctors at the UIHC Oncology Department subsequently recommended that Solomon undergo autologous peripheral blood stem cell transplant with high-dose chemotherapy (PBSCT).[2] Mr. and Mrs. Solomon filed a preauthorization claim for the treatment with the Plan's administrator in July 1999. Upon receipt of Solomon's claim, CADSI's Plan Administrator, Robert Stevenson, began the process of determining whether the Plan covered the proposed treatment by obtaining and reviewing medical records and treatment information from the UIHC. Consistent with the terms of the plan, Stevenson submitted the records and information to Plaines Health to assist in the coverage decision.

Although it is not legally a decision maker under CADSI's ERISA plan,-or for any other company for which SAFECO is the excess loss insurer-SAFECO offers its excess loss insurance customers a service known as an "excess loss referral assistance program." The program provides SAFECO, an excess loss insurance company with a wholly financial interest in disapproving any excess loss claims, and no legal right to make coverage decisions or to influence the decision making process of an ERISA plan administrator, the opportunity to review a claim so that SAFECO might provide the employer with advance notice as to whether a potential claim will be denied under the employer's excess loss policy. CADSI and its third-party administrator, Seabury & Smith, opted to utilize SAFECO's service and submitted the proposed claim to SAFECO on September 15, 1999, for its position on excess loss coverage. Five months had passed since Lynda Solomon was diagnosed with Stage IV breast cancer, and two months had elapsed without the Solomons receiving any information regarding their preauthorization claim.

SAFECO responded to the third-party administrator's submission in a September 22, 1999, facsimile, wherein SAFECO advised CADSI that although "it is the employer's decision to allow or deny Plan benefits," SAFECO deemed the procedure experimental and medically unnecessary. Def.App. 84–85. In "advis[ing] as to [SAFECO's] reimbursement position in the event of an Excess Loss claim," SAFECO's letter identified, deconstructed, and analyzed several provisions of the CADSI health benefits plan. *Id.* Specifically, SAFECO identified the term "medically necessary" both as a plan exclusion and a definition under the Plan. The explicit exclusion found in the Plan states:

> Notwithstanding any other provisions of this Plan to the contrary, eligible expenses will *not* include the following:

1. Tragically, over ninety percent of women who develop Stage IV breast cancer die within five years, and fifty percent of this group die within twenty-four months of the diagnosis.

2. Defendant refers to this procedure as Peripheral Blood Progenitor (Stem) Cell Transplant, or PBPCT. The Plaintiff, and most of the medical documents submitted to the Court, refer to this procedure as Peripheral Blood Stem Cell Transplant, or PBSCT. For consistency, the Court will use the acronym "PBSCT" throughout.

(f) for charges made that are not medically necessary or are in excess of reasonable and customary charges as determined by industry standards;

Def.App. at 68 (emphasis in original).

In the "General Definitions" section, the Plan defines "medically necessary" as follows:

Health care services, supplies or treatment that are required to identify or treat the illness or injury which a physician has diagnosed or reasonably suspects. To be medically necessary the service, supplies or treatment must be:

a) consistent with the diagnosis and treatment of the patient's condition;

b) consistent with professionally recognized standards of health care;

c) not solely for the convenience of the patient, physician or supplier; and

d) performed in the least costly setting required by the patient's medical condition.

The fact that a physician may have prescribed, ordered, recommended, or approved the services, supplies or treatment does not necessarily mean that they satisfy the above criteria.

Def.App. at 25.

SAFECO's letter also implicated the Plan provision excluding "experimental procedures." The exclusion for "experimental procedures" states:

Notwithstanding any other provisions of this Plan to the contrary, eligible expenses will *not* include the following:

r) expenses in connection with or related to Experimental Procedures or services or which are performed solely for research purposes, or organ transplants which are experimental in nature;

Def.App. at 43. (emphasis in original).

The Plan defines, in pertinent part, "Experimental Procedure" as:

(1) care, procedure, treatment protocol or technology which: (a) is not widely accepted as safe, effective or appropriate for the injury or sickness throughout the recognized medical profession and established medical societies of the United States; or (b) is experimental, in the research or investigational stage or conducted as part of research protocol, or has not been proved by statistically significant randomized clinical trials to establish increased survival or improvement in the quality of life over other conventional therapies. . . .

The Plan Administrator may rely on one or more of the following in determining experimental procedures: the Data project of the American Medical Association, the National Institute of Health, the U.S. Food and Drug Administration, The National Cancer Institute, Office of Health Technology Assessment, Health Care Financing Administration, or Congressional Office of Technology Assessment. The final decision shall be at the discretion of the Plan Administrator.

Def.App. at 23.

In addition to analyzing and interpreting the terms of the health benefits plan administered and funded by CADSI, with the assistance of third party administrator Seabury & Smith and medical consultant Great Plaines, SAFECO's letter provided the medical review opinions of three anonymous, yet assuredly independent, oncologists selected by SAFECO. CADSI's Plan Administrator compared the letters from SAFECO's experts with the information originally submitted by the UIHC, which indicated that the University of Iowa hospitals have over ten years of experience with the procedure in question. Upon so doing, Stevenson concluded that the UIHC had achieved greater success than the anonymous opinions indicated existed elsewhere.

Two days after receiving SAFECO's letter, on September 24, 1999, Stevenson received an opinion from the medical case manager at Plaines Health, the independent medical review service required and approved by SAFECO. In the opinion, Great Plaines medical director, Alan Bart Cameron, M.D., F.A.A.F.P., D.A.B.F.P., a physician with over 25 years experience, concluded that the treatment was "not specifically excluded in the certificate language," and was "found to be medically necessary." Pl.App. Ex. 6.

Stevenson forwarded SAFECO's anonymous opinions to Dr. Roger Gingrich, one of the UIHC oncologists involved in the treatment of Solomon. Gingrich provided a follow-up, rebuttal opinion on November 15, 1999, indicating weaknesses in the anonymous opinions, specifically that the opinions had relied upon unpublished studies while ignoring another study which indicated the procedure was effective and medically necessary in this case. Gingrich further indicated that the opinions seemed to ignore the UIHC's years of experience and the success rate of the procedure. Stevenson submitted Gingrich's opinion to SAFECO for reconsideration of their prior position regarding excess loss coverage. In so doing, Stevenson requested rebuttal opinions from the original three medical reviewers previously selected by SAFECO. SAFECO provided these opinions to CADSI in January, 2000. At this point, nine months had passed since Lynda Solomon received a diagnosis from which the majority of women die within twenty-four months of receiving, and six months had now elapsed without the Solomons receiving any information regarding the administration of their preauthorization claim. And, while plan beneficiaries are compelled to wait for administrative preauthorization, cancer is not; as her condition worsened, Lynda Solomon elected to proceed with treatment in spite of the fact that she had received nothing regarding coverage from CADSI.

After considering all opinions and information provided, including: the original information provided by the University of Iowa Hospitals and Clinics; the original opinions provided by SAFECO's medical reviewers; the statement of Plaines Health's medical director; the rebuttal opinion of Dr. Gingrich; and the rebuttal opinions provided by SAFECO's medical reviewers, Stevenson approved the claim. Relying on his discretionary power as Plan Administrator Stevenson adjudged the procedure both medically necessary and not experimental in nature. Following the approval, CADSI entered into an installment plan agreement to pay the medical bills incurred by Solomon at the UIHC. As Solomon's claim exceeded the ten-thousand dollar individual excess loss limit, CADSI filed an excess loss claim with SAFECO. SAFECO denied the claim. CADSI filed this suit seeking total reimbursement for expenses above the individual excess loss limit paid by CADSI to the UIHC, $146,482.62.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine," "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if the dispute over it might affect the out-

come of the suit under the governing law. *Id.*

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. In order to survive a motion for summary judgment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505.

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *United States v. City of Columbia*, 914 F.2d 151, 153 (8th Cir.1990). The Court does not weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genu-

ine and material. *Id.* In the present case, both sides have moved for summary judgment. There are no facts in dispute. The case is ripe for disposition by summary judgment.

## III. DISCUSSION

CADSI's employer funded health benefits plan is an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. Ordinarily, the mere mention of ERISA preempts any state law within earshot.[3] In the present case, however, ERISA preemption does not attach, because the case revolves around an insurance policy dispute between an insurer/insured (CADSI) and an excess loss insurer/reinsurer (SAFECO), rather than CADSI's administration of its Plan. Thus, although ERISA provides the backdrop, the present case relies on diversity jurisdiction to stand before the Court, and then asks a question under Washington state contract law regarding whether CADSI's expenses for authorizing Lynda Solomon's cancer treatment are "covered" under the excess loss insurance policy.

In its motion for summary judgment, Plaintiff argues that the clear and unambiguous language of the excess loss insurance policy incorporates the terms of CADSI's Plan as part of the excess loss policy. Plaintiff further contends that the Plan provides CADSI, as Plan Administrator, with sole discretionary authority to determine whether a particular claim is covered by the terms of the Plan. Accord-

---

3. Pursuant to ERISA, "'any and all state laws, whether they be laws aimed at employee benefit plans or merely generally applicable laws are preempted insofar as they ... relate to any employee benefit plan.'" *Union Health Care, Inc. v. John Alden Life Insurance Company*, 908 F.Supp. 429, 431 (S.D.Miss. 1995) (quoting 29 U.S.C. § 1144(a)). This is commonly known as ERISA Preemption.

While this preemption is broad, "it is not limitless; and it does not extend to state causes of action that affect employee benefit plans in 'too tenuous, remote, or peripheral a manner.'" *Id.* (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 100 n. 21, 103 S.Ct. 2890, 2900, 2901 n. 21, 77 L.Ed.2d 490 (1983)).

ingly, CADSI argues that SAFECO's excess loss coverage liability extends to all covered claims absent an abuse of discretion by the Plan Administrator.

In its own motion for summary judgment, SAFECO argues that CADSI's authority as Plan Administrator can only bind the Plan to provide or deny coverage for plan beneficiaries, but that the same exercise of discretion cannot unilaterally bind SAFECO. SAFECO, therefore, argues that it has no obligation to provide reimbursement for a procedure that SAFECO has concluded is expressly excluded by the terms of the Plan and the contract between CADSI and SAFECO. Both parties agree that this case involves only the contractual obligations of SAFECO to CADSI. Resolution of the case, therefore, hinges on the Court's construction and interpretation of the excess loss insurance policy, which is always a question of law. *John Deere Ins. Co. v. Shamrock Industries, Inc.*, 929 F.2d 413, 417 (8th Cir.1991).

## A. Applicable Law

As noted above, the fact that this case arose from a payment Plaintiff made under its Employee Benefit Plan does not invoke ERISA preemption. Rather, Washington law governs this case per SAFECO's excess loss insurance policy, which mandates that the laws of Washington State govern any dispute regarding the policy.

■ Under well established principles of Washington law, reviewing courts construe insurance policies as contracts, and, in so doing, apply all relevant rules of contract construction and interpretation. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wash.2d 654, 15 P.3d 115, 122 (2000); *Panorama Village Condo. Owners Ass'n Bd. of Dir. v. Allstate Ins. Co.*, 144 Wash.2d 130, 26 P.3d 910, 913–14 (2001). The Court, therefore, construes the policy "as a whole, with the policy being given a 'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" *Weyerhaeuser*, 15 P.3d at 122 (citations omitted). If the contract language is clear and unambiguous, "the court must enforce it as written and may not modify it or create ambiguity where none exists." *Id.* "A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable." *Id.* If a clause is ambiguous, the Court may attempt to resolve the ambiguity by referencing extrinsic evidence of the parties' intent. *Id.* Should any ambiguity remain after examining applicable extrinsic evidence, the dispute is resolved against the drafter-insurer and in favor of the insured. *Id.* Examination of the excess loss policy between CADSI and SAFECO evinces no ambiguity. The Court will, therefore, construe and enforce the whole policy as written.

## B. "Covered Expenses" and Contract Interpretation

■ The entirety of the present dispute resides in one sentence from SAFECO's excess loss insurance policy contract; SAFECO "will reimburse you for a percentage of the amount of covered expenses you have paid for covered persons under your plan." Def.App. at 67. SAFECO denied CADSI's excess loss claim because SAFECO had previously concluded that Lynda Solomon's breast cancer treatment was an experimental procedure, medically unnecessary, and, therefore, not covered under the health benefits plan CADSI administered and funded. Befittingly, SAFECO would have the Court interpret the phrase "covered expenses you have paid for covered persons under your plan," to mean covered under your plan if after an independent investigation, SAFECO determines the expenses are covered under your plan. CADSI views the clause as

an obligation for SAFECO to pay all claims deemed covered by CADSI's Administrator, absent an abuse of discretion. The Court identifies a third interpretation; CADSI's coverage decision is unilaterally binding on SAFECO.

At first glance, the three interpretations of SAFECO's policy language would seem to suggest patent ambiguity in the language of the clause. Ambiguity exists, however, only when, on its face, a clause is susceptible to two different yet reasonable interpretations. *Weyerhaeuser*, 15 P.3d at 122. In the present case, although the Court identifies three interpretations to which the clause is susceptible, only one interpretation is reasonable.

Case law from other jurisdictions holds that an interpretation giving CADSI the unilateral authority to bind SAFECO as excess loss insurer is unreasonable. *See Behavioral Sciences Institute v. Great–West Life*, 84 Wash.App. 863, 930 P.2d 933, 939–940 (1997) (holding that excess loss insurance company had standing to challenge an ERISA plan administrator's coverage decision, because to suggest otherwise could lead to unfair and absurd results); *Canada Life Assurance Co. v. Pendleton Memorial Methodist Hosp.*, 1999 WL 243653, *5 (E.D.La.1999) (agreeing with the *BSI* court that unilateral power of ERISA plan administrator to bind excess loss carrier is unreasonable). This Court has serious misgivings over SAFECO's suggested interpretation. For the reasons explained below, the Court holds that providing an excess loss insurance company with the unfettered power to control a plan administrator's decision making process by promising to withhold payment or by making post hoc coverage decisions runs afoul of ERISA and public policy, and is most definitely unreasonable.

The remaining interpretation, as suggested by Plaintiff, presents the only reasonable interpretation of the clause. Under the terms of the excess loss policy, a claim is a covered expense under the plan when, absent an abuse of discretion, the Plan Administrator determines the claim is covered under the plan. The Washington Court of Appeals expressed concern over unfair and absurd results that might occur if the plan administrator had absolute power to unilaterally bind the excess loss insurer. *BSI*, 930 P.2d at 939–940. Based on its concerns, the court held simply that the excess loss insurer had standing to challenge the plan administrator's coverage decision. *Id.* Neither the Washington court, nor the Louisiana District Court in *Canada Life* suggested that the inverse must be true; that the insurer would have absolute power to deny claims at its fancy where the plan administrator does not.

Further supporting its argument, Plaintiff identifies several express limitations from SAFECO's excess loss policy which limit SAFECO's reimbursement obligations to CADSI for paid expenses. The sum of the exclusions evidences SAFECO's effort to intentionally divorce itself from the claims review and decision making process to avoid the purview of ERISA. And while the Court notes SAFECO's success in evading the regulatory constraints of ERISA, the Court believes that such conduct deserves nary a reward. SAFECO enjoys no greater rights than those of a plan participant or beneficiary.

Lastly, Plaintiff notes that SAFECO's excess loss policy fully incorporates the CADSI Plan. The policy recites, in pertinent part, that "[t]he Employer's Participation Agreements, *Employee Benefit plans*, ... and all provisions in this and the following pages, ... are *part of this policy*." Def.App. at 66 (emphasis added). As well, the "Definitions" section of the policy provides the following definition: "Contract refers to the separate contractu-

al agreement between SAFECO and you, consisting of this policy, any amendments to this policy, and your Participation Agreement, *employee benefit plan* and Schedule." Def.App. at 69 (emphasis added). Clearly, CADSI's Self–Funded Employee Health Benefit Plan, along with all of its provisions, is incorporated into the excess loss contract between CADSI and SAFECO.

Arguing against CADSI's interpretation of "covered expenses," SAFECO places special emphasis on the language preceding the limitation for "expenses in connection with or related to Experimental Procedures." SAFECO argues that the line, "Notwithstanding any other provision of this Plan to the contrary, eligible expenses will not include the following ..." segregates this limitation from the rest of the policy, and should, therefore, be separated from the usual discretion of the Plan Administrator. The argument is unpersuasive.

The opening page of the CADSI Plan offers the following disclaimer:

[CADSI] shall have such duties and powers as may be necessary to discharge its responsibilities hereunder, including, but not by way of limitation, the expressed authority:

a) to *interpret this Plan,* decide all questions of eligibility for Plan participation and benefits, and determine the amount, manner and timing of contributions, and all such interpretations, decisions and determinations made in good faith by the Employer shall be conclusive and binding upon Plan participants;

. . .

In exercising it authority under this Plan, the Fiduciary and/or Plan Administrator and any such designated subsidiaries and affiliates *shall have discretionary authority to determine whether and to what extent partici-*

*pants and beneficiaries are entitled to benefits, and to construe disputed or doubtful Plan terms.* The Fiduciary and/or Plan Administrator and any such designated subsidiaries and affiliates shall be deemed to have properly exercised such authority unless they have abused their discretion hereunder by acting arbitrarily and capriciously.

Pl.App. 36–37 (emphasis added). The disclaimer clearly and unambiguously gives CADSI the sole authority to interpret the entire plan, and to make coverage determinations. Moreover, unlike *BSI* and *Canada Life,* the plan administrator here did not use its discretion to disregard express exclusions to plan coverage. *See BSI,* 930 P.2d at 936 (plan eligibility); *Canada Life,* 1999 WL 243653 at *2 (plan administrator approved coverage in spite of plan exclusion for illegal activities, where beneficiary's intoxication led to the injury causing car accident). While CADSI's health benefits plan, as it is fully integrated into the excess loss policy, provides the plan administrator with broad discretionary authority to interpret the plan, the plan specifically references the administrator's discretion in the plan definition for "Experimental Procedures." The last line of the definition states: "The final decision shall be at the discretion of the Plan Administrator." Def.App. at 23. Coupling the general grant of discretionary authority from the beginning of the plan with the reiteration in the definition of "Experimental Procedures," begets the undeniable conclusion that CADSI's plan administrator alone has the authority to determine whether a procedure is experimental. As the excess loss policy fully incorporates the CADSI Plan, the Court holds that SAFECO is bound by the Plan Administrator's decision absent an abuse of discretion, for which SAFECO, like a

plan beneficiary, bears the burden of proving.

## C. Abuse of Discretion

■ Having determined the applicable standard of review, the Court must now apply the standard to the present case. Because the Court has held that SAFECO is entitled to no greater rights in challenging the actions of a plan administrator than a plan beneficiary under ERISA, the Court looks to the oft-repeated standards applicable to ERISA cases. Although ERISA contains no standard of review, the Supreme Court has famously held that a reviewing court should apply a de novo standard of review unless the plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where, as here, the plan grants the administrator discretionary authority, the Court reviews the administrator's decisions only for abuse of discretion. *Id.* at 115, 109 S.Ct. 948; *Donaho v. FMC Corp.,* 74 F.3d 894, 898 (8th Cir.1996). In determining whether a plan administrator abused its discretion, the proper inquiry is "whether the plan administrator's decision was reasonable; i.e. supported by substantial evidence." *Donaho,* 74 F.3d at 899. In conducting this analysis, the Court considers only the evidence before the plan administrator when the claim was denied, or approved as is this case.

To ascertain the reasonableness of the plan administrator's factual review and application of the plan language in making a coverage decision, the Court looks to whether the decision was supported by substantial evidence. *Farley v. Arkansas Blue Cross and Blue Shield,* 147 F.3d 774, 777 (8th Cir.1998). Substantial evidence is more than a scintilla, but less than a preponderance. *Sahulka v. Lucent Technolo-* *gies, Inc.,* 206 F.3d 763, 767–68 (8th Cir. 2000). Important in this review is that the Court will not substitute its judgment for that of the administrator. That is, the Court will not overturn an administrator's decision simply because the Court disagrees. *Donaho,* 74 F.3d at 899. Rather, the discretionary standard is whether a reasonable person, given the evidence presented in the administrative record, could have reached the same decision, not whether the reasonable person would have reached a like decision. *Cash v. Wal-Mart Group Health Plan,* 107 F.3d 637, 641 (8th Cir.1997).

CADSI's decision to approve coverage for Lynda Solomon's cancer treatment is a model of reasonableness. The only factor hinting at unreasonableness is the delay in reaching a decision caused by SAFECO's "referral assistance service," and the anonymous contradictory opinions provided therefrom. Robert Stevenson, CADSI's plan administrator, reviewed all information submitted by the Solomons. Stevenson submitted the claim to Plaines Health and Seabury & Smith for their review as required by SAFECO. Stevenson's efforts in making an informed decision did not end at this point. Rather, Stevenson had Seabury & Smith submit the claim to SAFECO for their review. He personally examined the anonymous contradictory opinions submitted by SAFECO's experts. Stevenson then sent the SAFECO opinions to UIHC experts for review. With the exception of the anonymous expert opinions provided by SAFECO, the insurer who would be liable for payment if CADSI approved the claim, all of the information and opinions reviewed by Stevenson concluded that Lynda Solomon's cancer treatment was not experimental, was medically necessary, and was covered under the plan. Moreover, within days after SAFECO opined that Solomon's claim was medically unnecessary and experimental,

Plaines Health, the company SAFECO insisted that CADSI contract with for determining medical eligibility questions, assured CADSI that Plaines Health deemed the procedure covered under the plan. Only after compiling and analyzing all available information did CADSI determine that Lynda Solomon's treatment was covered under the plan. The decision was based on substantial evidence. Not only *could* a reasonable person reach CADSI's decision, in the Court's opinion, no reasonable person *would* reach an alternate conclusion. CADSI did not abuse its discretion as Plan Administrator in approving Solomon's claim. SAFECO did breach its contractual obligation to CADSI by refusing to pay CADSI's excess loss claim.

## IV. CONCLUSION

The case at bar presents the Court with a disturbing and, perhaps, heretofore uncontemplated twist on the traditional ERISA case. Here, the plaintiff is not the plan beneficiary seeking redress for an administrator's failure to approve a particular claim. In this case, the plan beneficiary is receiving the treatment she requested. Rather, the present dispute illuminates the troubling reality that excess loss insurers, with purely financial motives, can effortlessly usurp discretionary authority from ERISA plan administrators simply by "advising" the insured that any claim for excess loss coverage will be denied. The reality of the insurance company's advising program is that a third-party entity controls-vis à vis the all-important power of the purse-the determination of whether the plan beneficiary will receive the cancer treatment that she has requested, desires, and needs for a chance to survive. The practice turns the very foundation of ERISA on its head, and undermines Congress's intent in enacting a regulatory scheme:

> to protect [ . . . ] the interests of participants in employee benefit plans and

their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001.

When excess loss insurance carriers, with a clear financial conflict of interest, rather than statutorily mandated plan administrators make coverage decisions, plan participants are denied every benefit envisioned by Congress in enacting ERISA. Gone are established standards of conduct and responsibility and obligations for fiduciaries. If coverage decisions are made by an excess loss insurance company, ERISA offers no remedy, no sanctions, and no access to the Federal courts for the plan beneficiary who has been wrongfully denied benefits because her plan's excess loss insurance carrier preemptively denied the claim. Such the law cannot be.

SAFECO entered into an agreement to reimburse CADSI for "a percentage of the amount of covered expenses [it pays for] covered persons under [the] plan." Lynda Solomon's eligibility as a plan beneficiary is undisputed. CADSI's Plan Administrator reasonably relied on substantial evidence in determining her treatment to be covered under the plan. This Court will not re-write any contract to provide a third party insurer, with whom the plan beneficiary has no relationship and no recourse, with the absolute ability to influence and likely prevent plan beneficiaries such as Lynda Solomon from the opportunity to receive medically necessary treatments that might offer her a chance to survive.

## V. ORDER

Plaintiff's motion for summary judgment is granted. Defendant's motion is denied.

Defendant is hereby ordered to pay to Plaintiff, damages in the amount of $146,482.62 plus interest since the date of denial.

IT IS SO ORDERED.